UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DARNELL TUBBS,
a/k/a Darnell Johnson

                        Plaintiff,

    -against-                                            9:19-CV-0126 (LEK/DJS)

DON VENETTOZZI, *et al.*,

                        Defendants.

# DECISION AND ORDER

**I.    INTRODUCTION**

On January 31, 2019, Plaintiff Darnell Tubbs filed this action pursuant to 42 U.S.C. § 1983 alleging that prison officials violated his constitutional rights while he was incarcerated at Upstate and Great Meadow Correctional Facilities. Dkt. No. 1 ("Original Complaint"). He also submitted an application for leave to proceed in forma pauperis ("IFP"). Dkt. No. 6 ("IFP Application").[1] On April 22, 2019, the Court granted the IFP Application and reviewed the Complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b). Dkt. No. 10 ("April 2019 Order"). The Court found that Plaintiff's claims against two defendants—Corrections Officer Wayne Garland and Deputy Superintendent Pete Woodruff—survived the initial review and required a response. Id. at 26. Now before the Court is Plaintiff's amended complaint. Dkt. No. 15 ("Amended Complaint").

---

[1] Plaintiff's initial application to proceed IFP was denied as incomplete and the action was administratively closed. Dkt. No. 4 ("January 2019 Order"). Plaintiff then filed a letter motion requesting Court assistance with certification of an IFP application. Dkt. No. 5 ("Letter Motion"). Before the Court acted on Plaintiff's Letter Motion, Plaintiff filed his IFP Application, and this case was re-opened. Dkt. No. 8 ("March 2019 Text Order").

## II. DISCUSSION

### A. The Complaint and April 2019 Order

The Original Complaint asserted the following claims: (1) a claim for denial of access to the state FOIL and grievance procedures against Upstate Superintendent Donald Uhler; (2) a First Amendment free-flow-of-mail claim against Uhler; (3) an Eighth Amendment excessive-force claim against Corrections Officer Wayne Garland; (4) an Eighth Amendment failure-to-protect claim against Uhler; (5) an Eighth Amendment conditions-of-confinement claim against Uhler; (6) Eighth Amendment medical indifference claims against Uhler and Garland; (7) First Amendment retaliation claims against Garland and Deputy Superintendent of Security Pete Woodruff; and (8) Fourteenth Amendment disciplinary due process claims against Woodruff and Director of Special Housing Don Venettozzi. Apr. 2019 Order at 10–11.

The Court found that the following claims survived sua sponte review and required a response: (1) Plaintiff's Eighth Amendment excessive force claim against Garland; and (2) Plaintiff's First Amendment retaliation claims against Garland and Woodruff. Id. at 26. It dismissed the remaining claims without prejudice because they failed to state claims on which relief could be granted. As a result, the Court dismissed two other defendants—Director of Special Housing Don Venettozi and Superintendent Donald Uhler—from the action without prejudice. Id.

### B. Review of the Amended Complaint

Because Plaintiff is proceeding IFP and is an inmate suing government employees, the Court must review his Amended Complaint to determine whether it states plausible claims for relief. §§ 1915(e)(2)(B) & 1915A(b). The Court previously discussed the legal standard

governing this review at length. See Apr. 2019 Order at 3–4.

The Amended Complaint renames Uhler, Garland, Woodruff, and Venettozzi as defendants and adds claims against: (1) Office of Mental Health Unit Chief Jane Waldren; (2) Office of Mental Health Rehabilitation Counselor Jeniffer Gravel; (3) Corrections Officer Randy Mitchell; (4) Corrections Officer Michael Manson; and (5) Facility Health Service Director Doctor ViJay Mandalaywa. Am. Compl. at 1.

Liberally construed, the Amended Complaint asserts the following claims: (1) First Amendment access-to-courts claims against Uhler, Garland, and Manson; (2) First Amendment free-flow-of-mail claims against Uhler, Garland, and Manson; (3) Eighth Amendment excessive force claims against Garland and Mitchell; (4) an Eighth Amendment failure-to-protect claim against Uhler; (5) an Eighth Amendment conditions-of-confinement claim against Uhler; (6) Eighth Amendment medical indifference claims against Uhler, Garland, Gravel, Waldren, and Mandalaywa; (7) First Amendment retaliation claims against Garland, Woodruff, and Manson; and (8) Fourteenth Amendment due process claims against Woodruff, Venettozzi, and Uhler. Plaintiff repeats the facts in the original Complaint and adds new allegations in an attempt to revive his dismissed claims and support his new ones.

As always when reviewing a complaint under § 1915, the Court takes the allegations as fact and construe them in a way most favorable to Plaintiff. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

  1. *Access-to-Courts Claims*

Plaintiff alleges his ordeal began around March 2016, when he complained to prison officials about "a number of issues with staff involving food, mail, and the denial of certain

privileges" and requested surveillance video using the New York Freedom of Information Law ("FOIL"). Am. Compl. at 3. Soon after, Plaintiff started having more "issues with [his] mail involving tampering—not receiving complete letters, not receiving mail, empty envelopes, legal mail not leaving the facility and the like." Id. He tried to file additional grievances about these issues. Id. However, only eight of these seventeen grievances were "filed," the first being "processed" on June 20, 2016. Id.

Plaintiff suspects that staff members were obstructing his mail in retaliation for his past grievances and to prevent him from filing new ones. Id. at 3–4, 12 ("Upon information and belief, the intent of the [mail and grievance] thwarting, [property] tampering, and denials was to curb and interfere with my rights to access the court and retaliation."). He believes that Garland and Manson were responsible. Id. 16–17. For example, Manson lost or destroyed "legal mail, legal documents, stamps, and more" while transferring Plaintiff to a new cell. Id. at 7. Plaintiff asserts that by "thwarting" Plaintiff's grievances, Garland and Manson prevented him from exhausting his administrative remedies and, therefore, impeded him from litigating his constitutional claims in court. See id. at 3 (indicating that Plaintiff believes Garland and Mason intended to "interfere with the PLRA [Prison Litigation Reform Act, which requires inmates to exhaust their administrative remedies before suing] needed to access the courts").

The constitutional "right of access to the courts," requires states "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." Bounds v. Smith, 430 U.S. 817, 828 (1977). "To state a claim for denial of access to the courts—in this case due to interference with legal mail—a plaintiff must allege that the defendant 'took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.'"

4

Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003) (quoting Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir. 1997)). "Mere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation;" the defendants' conduct must have "caused [the] plaintiff to miss court deadlines" or otherwise "prejudice[d] his legal actions." Davis, 320 F.3d at 352 (citations omitted). In addition, "the injury requirement is not satisfied by just any type of frustrated legal claim." Lewis v. Casey, 518 U.S. 343, 353–54 (1996). Rather, the state must interfere with the inmate's ability "to attack [his] sentence" or "challenge the conditions of [his] confinement." Id. at 355. As the Court explained earlier, inmates have no constitutional right to invoke a prison's internal grievance process. Apr. Order at 12 (citing, e.g., Rhodes v. Hoy, No. 05-CV-836, 2007 WL 1343649, at *6 (N.D.N.Y. May 5, 2007)).

Even if Defendants prevented Plaintiff from filing grievances, this would not infringe his right to access the courts. Official interference with the grievance process would excuse Plaintiff's failure to exhaust his claims. See Arnold v. Goetz, 245 F. Supp. 2d 527, 537 (S.D.N.Y. 2003) ("[W]here a prisoner has made a 'reasonable attempt' to file a grievance, and prison officials have prevented the prisoner from filing that grievance, the grievance procedure is not 'available' to the [inmate], and thus the [PLRA] does not preclude the prisoner from suing in federal court."). Moreover, while Plaintiff alleges that some of his legal documents were lost or destroyed, he does not claim that this affected any litigation. Compare White v. Marinelli, No. 17-CV-1094, 2019 WL 1090802, at *15 (N.D.N.Y. Mar. 8, 2019) (dismissing access-to-courts claim because "Plaintiff [did] not explain how the [withheld] video footage might have changed the state court's conclusion that the exclusion of witnesses and documentary evidence from his

5

hearing was constitutional") with O'Diah v. Fischer, No. 08-CV-941, 2012 WL 987726, at *12 (N.D.N.Y. Feb. 28, 2012), adopted, 2012 WL 976033 (N.D.N.Y. Mar. 22, 2012) (access-to-courts claim survived dismissal where plaintiff alleged that his state court case was dismissed because prison officials "intentionally failed to send the mail out"). Accordingly, Plaintiff's access-to-courts claims are dismissed.

### 2. Free-Flow-of-Mail Claims

"In addition to the right of access to the courts, a prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." Davis, 320 F.3d at 351. The legal standard governing a First Amendment free-flow-of-mail claim was detailed in the April 2019 Order. See Apr. 2019 Order at 12–13. Relevant here—and to adequately plead any constitutional violation—Plaintiff must state facts suggesting the "personal involvement" of the defendant in bringing about the violation. Id. at 11 (citing Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994). As relevant here, an official may implicate himself in constitutional wrongdoing if he "participated directly" in it, "created a policy or custom under which unconstitutional practices occurred," Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995), or "exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring" or would occur, Vincent v. Yelich, 718 F.3d 157, 173 (2d Cir. 2013); see also Burton v. Lynch, 664 F. Supp. 2d 349, 360 (S.D.N.Y. 2009) (holding that to find personal involvement, "an alleged constitutional violation complained of in a grievance must be 'ongoing' . . . such that the 'supervisory official who reviews the grievance can remedy [it] directly'") (citation omitted). In any event, the official-defendants must, "through their own actions . . . satisfy each element of the underlying constitutional tort." Turkmen v. Hasty, 789 F.3d 218, 250 (2d Cir. 2015) (citing

6

Iqbal, 556 U.S. at 676), rev'd on other grounds, Ziglar v. Abbasi, 137 S.Ct. 1843 (2017). Thus, the defendant must exhibit "deliberate indifference when the underlying constitutional violation requires no more than deliberate indifference." Turkmen, 789 F.3d at 250; see also Apr. Order at 17–18.

Like the Complaint, the Amended Complaint does not state why Plaintiff believes Garland or Manson interfered with his incoming or outgoing mail. He does not suggest that either defendant was ever responsible for picking up or delivering his mail, or that he ever entrusted mail to either of them.

With respect to Uhler, the Amended Complaint alleges that he was "aware" of the mail tampering for more than a year but failed to remedy it. Am. Compl. at 14. However, Plaintiff still does not identify any factual basis for this conclusion. He states that the mail tampering began on March 2016, and that he submitted seventeen grievances about various issues, only eight of which were "processed," beginning on June 20, 2016. Am. Compl. at 3. The Amended Complaint does not contain any allegations indicating the number of grievances Plaintiff submitted about alleged mail tampering, how or when he complained to Uhler about alleged mail tampering, what the complaint said, or whether the tampering continued after Uhler received notice of it (such that he could have stopped it). See Grullon v. City of New Haven, 720 F.3d 133, 141 (2d Cir. 2013) (holding that prisoner could plausibly allege a warden was deliberately indifferent to dangerous conditions of confinement "if his amended complaint contained factual allegations indicating that [the prisoner's] [l]etter was sent to the Warden at an appropriate address and by appropriate means" ); Price v. Oropallo, No. 13-CV-563, 2014 WL 4146276, at *1 (N.D.N.Y. Aug. 19, 2014) (dismissing failure-to-protect claim against supervisory officials

7

because the "[c]omplaint d[id] not allege facts plausibly suggesting . . . that [the] [p]laintiff sent [his] letters to [the officials] at an appropriate address and by appropriate means").

Accordingly, the First Amendment free-flow-of-mail claims are once again dismissed.

### 3. *Conditions-of-Confinement Claim*

Following the mail issues—and Plaintiff's resulting complaints to the administration—Plaintiff states that he "began to receive direct harassment and threats by . . . Garland and Mason as well as unknown [corrections officers] and sergeants who made it clear that [Plaintiff's] complaints, grievances, and attempts to access FOIL would continue to cause [him] problems." Am. Compl. at 4. In September 2016, he was taken to Great Meadow Correctional Facility for a medical appointment. Id. As in the Original Complaint, he asserts that he was then confined in inhumane living conditions in a Great Meadow Special Housing Unit ("SHU") cell for just over two weeks. Am. Compl. at 4. He writes that the cell "was filthy with insects, dirt, grime, and human waste," violating the "minimum standards" prescribed by prison regulations. Id.; see also Apr. 2019 Order at 21 (discussing the standard for pleading an Eighth Amendment conditions of confinement claim).

Plaintiff suggests that Uhler was responsible for the unsanitary cell conditions because he authorized them. Id. at 4, 14. He reasons that Uhler "approves medical appointments," and Plaintiff was at Great Meadow for a medical appointment. Id. However, even if Uhler, as Superintendent, approves medical transfers, Plaintiff has not given a reason to believe that Uhler knew of Plaintiff's cell conditions or had authority over Plaintiff's cell assignment at Great Meadow, a facility he does not oversee. Id. at 2. Accordingly, Plaintiff's Eighth Amendment conditions-of-confinement claim against Uhler is dismissed.

*4. Excessive Force and Failure-to-Protect Claims*

On September 30, 2016, when Plaintiff returned from Great Meadow to Upstate, he asked Offender Rehabiliation Coordinator T. Kane (not a defendant) about "sexual threats" Plaintiff had received and "PREA [Prison Rape Elimination Act] concerns [he] alerted [Kane] to before the medical trip." Id. at 5. He asked Kane "why no one saw [him] concerning this, and received a flippant response." Id. Plaintiff subsequently filed a grievance about his sexual harassment concerns and the exchange with Kane, but it was "thwarted." Id. "Threats of physical violence and threats of a sexual nature continued as [Corrections Officers] Garland and Mason promised to make [Plaintiff] their bitch." Id. After those comments, Plaintiff "immediately made numerous verbals and written complaints" to Uhler, the governor of New York, the Department of Corrections and Community Supervision, and the U.S. Department of Justice. Id.

Despite "no disciplinary infractions or any penological reason" Plaintiff was then "moved from a level 2 cell . . . to a level 1 cell," resulting in his loss of certain "privileges" such as "time cuts, phone calls, more recreation, more reading material, and more." Id. at 5. Plaintiff "submitted" a grievance regarding the cell relocation and "Garland and Manson denying [him] recreation," yet this, too, "was never filed." Id. On November 15, 2016, Garland told Plaintiff that he would "get nothing" because he "like[d] to write"—reminding Plaintiff that he and Mason had "manipulated medical" when Plaintiff previously requested "emergency sick call." Id.

Nevertheless, Plaintiff was later moved back to a level 2 cell. Id. There, on November 28, 2016, Sergeant Lane spoke to him about "two complaints concerning . . . Garland and others' threats, harassment, and constant tampering with [Plaintiff's] food." Id. "The complaints had been sent to Supt. Uhler from [the] N.Y.S. Governor and DOCCS central office, where [Plaintiff]

9

had mailed them." Id. at 4–5. The next day, on November 29, 2016, Garland, Mitchell, and other officers attacked and sexually assaulted Plaintiff his cell, until Sgt. Lane arrived and told the officers to "cut it out." Id. at 7. Taken to the holding pen, Plaintiff listened to the officers concoct a pretext for the assault. Id.; see also Apr. Order at 6–7.

The legal standard governing an Eighth Amendment excessive force claim was detailed in the April 2019 Order. See Apr. 2019 Order at 14–15. As also noted in that Order, "[t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." Hayes v. N.Y.C. Dept. of Corrs., 84 F.3d 614, 620 (2d Cir. 1996) (citing Farmer v. Brennan, 511 U.S. 825, 832 (1994)). "Courts have found that a prisoner validly states an Eighth Amendment claim based on a failure to protect when he alleges that he informed corrections officers about a specific fear of assault and is then assaulted." Davis v. Torres, No. 10-CV-2236, 2012 WL 3070092, at *5 (S.D.N.Y. May 2, 2012), adopted, 2012 WL 3070083 (S.D.N.Y. July 27, 2012); see also Beckles v. Bennett, No. 05-CV-2000, 2008 WL 821827, at *17 (S.D.N.Y. Mar. 26, 2008) (sending case to trial because the plaintiff presented evidence that he informed sergeant of correction officers' threatening behavior and was later assaulted by those officers). In some circumstances, a prisoner can succeed by showing "that he belongs to an identifiable group of prisoners who are frequently singled out for violent attack by other inmates," "even if the officials could not guess beforehand who would attack whom." Farmer, 511 U.S. at 843. However, "an inmate's communications about 'generalized safety concerns' or 'vague concerns of future assault by unknown individuals' are insufficient to provide knowledge that the inmate is subject to a substantial risk of serious harm." Stephens v. Venettozzi, No. 13-CV-5779, 2016 WL 929268, at *19 (S.D.N.Y. Feb. 24, 2016), adopted, 2016 WL 1047388

(S.D.N.Y. Mar. 10, 2016).

The excessive force claims against Garland and Mitchell state claims and require a response. See Am. Compl. at 15–16. Although the Eighth Amendment claims against Uhler present a closer question, see id. at 4, 13–14, the Court finds that they, too, require a response.

  5. *Medical Indifference Claims*

The legal standard governing an Eighth Amendment medical indifference claim was detailed in the April 2019 Order. See April 2019 Order at 19–20. Plaintiff's claim arises from the sexual assault's aftermath. He was taken to the infirmary, where an unnamed nurse "refused to view/examine [his] body for injuries." Am. Compl at 7. He told her he had just been "sexually abused" by correctional officers. Id. After hearing Plaintiff's accusation, she "would not listen to any more [of his] complaints," but took Plaintiff to the infirmary's emergency room. Id. There, with approximately five people who were not members of the medical staff watching, Physicians Assistant "Ahearn" (not a defendant) "order[ed]" Plaintiff to "[e]xpose [his] genitalia and anus" while she "joke[d]" about him and "pretend[ed] to examine [him]." Id. at 7, 16–17. Mandalaywa, a doctor at Upstate and the Facility Health Director, was present and observing this behavior. Id. at 17. Plaintiff later requested but was denied copies of his medical records. Id. at 7. Instead, he got a misbehavior report, which was written by Garland and alleged that Plaintiff "attempted to spit on him, and this prompted [the] use of physical force." Id.

As discussed below, Plaintiff found himself in disciplinary proceedings, facing solitary confinement. And Garland and Mason's "threats" and "taunts" only continued. Id. at 10–11. Plaintiff began contemplating suicide and requested emergency metal health treatment, but the Office of Mental Health ("OMH") ignored him. Id. He "threatened self-harm to Garland,

11

Mason," and a Sergeant Coryen, but the harassment persisted. Id. at 11. Later, Sergeant Coryen and OMH [staff member] Marinelli claimed that Plaintiff "swallowed numerous sharp metal objects," and he was placed on "one to one" suicide watch." Id. However, Plaintiff received no "x-ray or emergency medical attention." Id. Then, Plaintiff "left suicide watch and was taken to 1 on 1 contraband watch." Id. Plaintiff believes that Uhler "was notified" of both placements "and had to approve contraband watch." Id. He also believes Mandalaywa was responsible because of his directory position. Id. at 16. After Plaintiff left contraband watch, he finally saw a representative from the Office of Special Investigations ("OSI") about the sexual assault, who told Plaintiff he should have seen a therapist from OMH "long ago." Id.

On January 17, 2017, Plaintiff "met with OMH Gravel and an unknown doctor." Id. But they "addressed nothing having to do with PREA, wouldn't allow [Plainitff] to discuss [the rape], and concocted an event which made it so [the session] was for a request to see the psychologist for other reasons." Id. "Consequently, [Plaintiff] stayed for about four to six minutes and left with a diagnosis created with nefarious intent." Id. Gravel remained Plaintiff's assigned therapist, but "numerous" attempts to have sessions with her failed because Garland and Mason would "refuse" them arbitrarily. Id. at 12. "This forced Garland to come to the cell," but Plaintiff would understandably "refuse to have OMH counseling in the open amongst recorders and inmates." Id. Gravel "would pretend" these aborted sessions were completed. Id. Plaintiff complained about this lack of treatment through "letters and verbal complaints" to Gravel, the OMH Unit Chief, and various other authorities "to no avail." Id.

Plaintiff "eventually" began to receive counseling from "CVTC," a group that focuses on prison rape treatment. Id. However, he states that "threats by staff and issues with medical and

12

OMH continued without pause" and that Uhler was allegedly "constantly made aware, to no avail." Id.

### i. Gravel, Garland, and Mandalaywa

The Court finds that Plaintiff's medical indifference claims against Gravel and Garland, who allegedly refused him mental health treatment, survive sua sponte review and require a response. In addition, while a close question, the Court also finds that the claim against Mandalaywa, who allegedly supervised Ahearn's sarcastic examination of Plaintiff after his sexual assault, Am. Compl. 16–17, require a response. See Jean-Laurent v. Wilkinson, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (explaining that § 1983 liability can arise from fellow officer's failure to intervene to stop ongoing constitutional violation).

### ii. Waldren

On the other hand, Plaintiff does not allege facts sufficient to conclude that Waldren was involved in the alleged violations. Plaintiff is suing Waldren because she is the current Office of Mental Health Unit Chief. The Unit Chief who allegedly ignored his medical needs "retired." Am. Compl. at 15. However, Plaintiff can only sue individual defendants under § 1983;[2] any § 1983 claim against the office of the OMH unit chief (that is, against the unit chief in his or her "official capacity") for damages would be barred under the doctrine of sovereign immunity. Chris H. v. New York, 764 F. App'x 53, 55 (2d Cir. 2019). The Amended Complaint does not contain any allegations which plausibly suggest that Waldren himself was ever involved in Plaintiff's medical care (or any refusal to provide it). Therefore the claim against him is dismissed.

---

[2] Municipalities are also subject to suit, Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658 (1978), but none are defendants here.

### iii. Uhler

The Amended Complaint states that Uhler was "aware" that Plaintiff was "denied OMH assistance" for a period of "months" after Plaintiff was sexually assaulted, but that he failed to remedy the mistreatment. Am. Compl. at 10, 14. However, there are no allegations regarding when Plaintiff complained to Uhler (was there enough time for him to fix the problem?), how he complained (orally or by letter?), or what he said to Uhler. This is the same kind of "conclusory statement," "devoid of further factual enhancement," that cannot support a claim that Uhler knowingly allowed a serious deprivation of medical care. Iqbal, 556 U.S. at 678; see also Carpenter v. Apple, No. 15-CV-1269, 2017 WL 3887908, at *10 (N.D.N.Y. Sept. 5, 2017) (stating that a supervisory official can only be held liable for "fail[ing] to remedy a violation" if there was an "ongoing, and therefore correctable, constitutional violation[ ]—not a specific event that is later subject to formal review by designated officials once the constitutional violation has already concluded" (citation omitted)); Reid v. Bezio, 10-CV-0609, 2011 WL 1577761, at *7 (N.D.N.Y. March 30, 2011) (holding that where plaintiff did "not describe of what he specifically complained in the grievance [the defendant] denied. . . . Without further facts, it cannot simply be assumed that the appeal and grievance made Graham aware of ongoing constitutional violations"), adopted, 2011 WL 1585067 (N.D.N .Y. Apr. 26, 2011).

Accordingly, Plaintiff's Eighth Amendment medical indifference claim against Uhler is dismissed.

#### 6. Retaliation Claims

For the reasons set forth in the April 2019 Order, Plaintiff's First Amendment retaliation claims against Garland and Woodruff once again survive initial review and warrant a response.

See Apr. 2019 Order at 22–23. In addition, the Court finds that Plaintiff's retaliation claim against Manson—based on his denying Plaintiff privileges, interfering with his medical care, and threatening him in response to Plaintiff's grievances against Manson and other officers, Am. Compl. at 4–5, 16—also survives sua sponte review and requires a response.

### 7. Due Process Claims

On December 7, 2016, Plaintiff appeared at a disciplinary hearing on the false misbehavior report filed by Garland. Am. Compl. at 7–8. Woodruff was the hearing officer. Id. at 8. Plaintiff alleges that Woodruff (1) proceeded with the hearing even though Plaintiff had not received required assistance in preparing his defense; (2) withheld documentary evidence Plaintiff had requested; (3) denied Plaintiff's requests to call certain witnesses; (4) coached witnesses; (5) admitted tampered-with evidence; and (6) unreasonably ignored exculpatory evidence. Id. at 8–10; see also Apr. Order at 8–10. Plaintiff also alleges that (7) Woodruff had several conflicts of interest because he was involved in the initial investigation into the incident and was the subject of one of Plaintiff's grievances. Am. Compl. at 10. At the conclusion of the hearing, Woodruff found Plaintiff guilty of two charges—"unhygienic act" and "refusing a direct order"—and sentenced him to 120 days of SHU confinement without recreation, commissary, packages, or phone privileges. Id. at 10. Venettozzi affirmed Woodruff's finding of guilt with respect to the "unhygienic act" but dismissed the charge of "refusing a direct order." Id.[3]

The legal standard governing a Fourteenth Amendment due process claim was detailed in

---

[3] Plaintiff does not state when Venettozzi decided the appeal or whether the partial reversal resulted in a reduction of SHU sentence. For purposes of this Decision and Order only, the Court will assume that (1) the entirety of defendant Woodruff's sentence was imposed on Plaintiff, and (2) Venettozzi issued a decision regarding Plaintiff's appeal before Plaintiff had served the total amount of SHU confinement imposed.

15

the April 2019 Order. See Apr. 2019 Order at 23–24. While there is no bright-line rule on how long the state may place a prisoner in restricted confinement without having held a hearing, "[a] period of confinement between 101 and 305 days is considered to be an 'intermediate duration' and could implicate a liberty interest [triggering the need for a hearing] should a detailed record of the conditions of confinement indicate that it was an atypical and significant hardship." Bunting v. Nagy, 452 F. Supp. 2d 447, 456 (S.D.N.Y. 2006) (citing Sealey v. Giltner, 197 F.3d 578, 589 (2d Cir. 1999)); see also Palmer v. Richards, 364 F.3d 60, 64–65 (2d Cir. 2004) ("Where the plaintiff was confined for an intermediate duration—between 101 and 305 days—'development of a detailed record' of the conditions of confinement relative to ordinary prison conditions is required."). Therefore, the Court finds that Plaintiff's due process claims against Woodruff and Venettozzi—based on his 120-day confinement and various alleged procedural defects in his discplinary hearing—survive sua sponte review and require a response. See Koehl v. Bernstein, No. 10-CV-3808, 2011 WL 2436817, at *7 (S.D.N.Y. June 17, 2011) (concluding that allegations of 120 days in the SHU required discovery and fact-finding to determine "whether this intermediate sentence constitute[d] an atypical and significant hardship"), adopted, 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011).

The due process claim against Uhler, however, must be dismissed. Plaintiff alleges Uhler was "made aware verbally and via written complaints" of the due process deprivations, and that he "allowed a custom of disregard involving [Superintendent's] hearings." Am. Compl. at 13. However, as before, Plaintiff fails to indicate when he complained to Uhler about the alleged violation of his due process rights and how he did so. Furthermore, he does not factually support his charge that Uhler "allowed a custom" of due process violations in disciplinary hearing. Id.

Plaintiff identifies only one other time someone's due process rights were violated at Upstate; he alleges that on an unidentified date, he attempted to appeal a separate disciplinary determination to Venettozzi, who wrongly sent the appeal to Uhler even though Venettozzi was responsible for adjudicating it. Id. at 10. Plaintiff claims that he sent letters to Venettozzi and Uhler about this incident, which were ignored. Id. But Uhler's alleged failure to address a single other complaint does not plausibly suggest that Uhler created, or allowed the continuation of, a custom or policy of denying inmates due process during disciplinary proceedings. See, e.g., Parris v. New York State Dep't Corr. Servs., 947 F. Supp. 2d 354, 364 (S.D.N.Y. 2013) ("Allegations involving only a single incident are generally insufficient to demonstrate the existence of an official policy or custom for purposes of establishing personal involvement under § 1983.").[4]

Thus, the Amended Complaint also fails to sufficiently allege Uhler's personal involvement in the alleged violation of Plaintiff's due process rights. Accordingly, Plaintiff's Fourteenth Amendment due process claim against Uhler is dismissed.

**C. Dismissal with Prejudice**

To summarize, the Court dismisses Plaintiff's: (1) First Amendment access-to-courts and

---

[4] Nor do Plaintiff's allegations suggest that Uhler failed to train or monitor Venettozzi. See, e.g., Samuels, 168 F. Supp. 3d at 638 (noting that to support personal involvement based on a failure to train, the "plaintiff must show that the defendant knew or should have known that there was a high degree of risk that his subordinates would behave inappropriately, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to Plaintiff" (quoting Colon, 58 F.3d at 873)); Martin v. Patterson, No. 09-CV-1372, 2010 WL 3033796, at *3 (N.D.N.Y. July 16, 2010) ("Plaintiff's conclusory allegations that defendants failed to properly train staff and investigate the matter, and that current policy condones excessive force, is not enough to establish that [defendant] was aware of any history of excessive force toward plaintiff or at [the prison] in general."), adopted, 2010 WL 3033809 (N.D.N.Y. Aug. 3, 2010).

17

(2) free-flow-of-mail claims against Uhler, Garland, and Manson; (2) Eighth Amendment conditions-of-confinement claim against Uhler; (3) Eighth Amendment medical indifference claims against Uhler and Waldren; and (4) Fourteenth Amendment due process claims against Uhler. The Court already identified the flaws in Plaintiff's prior attempt plead most of these claims, Apr. Order at 11–14, 19–25, and gave him an opportunity to attempt to revive them, id. at 26 n.6. Although Plaintiff's claim against Waldren is new, Plaintiff admits that Waldren was not personally involved in any wronging and was only included in the Amended Complaint because of his official position. Am. Compl. at 15. The Court finds that Plaintiff would not cure these flaws if allowed to file a second amended complaint. Accordingly, the Court dismisses these claims with prejudice. See, e.g., Shuler v. Brown, No. 07-CV-0937, 2009 WL 790973, at *5 (N.D.N.Y. Mar. 23, 2009) ("Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.").

### III. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Amended Complaint is accepted for filing and is the operative pleading; and it is further

**ORDERED**, that the Clerk shall revise the docket to add the following individuals as defendants: (1) Office of Mental Health Unit Chief Jane Waldren; (2) Office of Mental Health Rehabilitation Counselor Jeniffer Gravel; (3) Corrections Officer Randy Mitchell; (4) Corrections Officer Michael Manson; and (5) Doctor ViJay Mandalaywa; and it is further

**ORDERED**, that the following claims **SURVIVE** sua sponte review and require a response: (1) the Eighth Amendment excessive force and failure-to-protect claims against Uhler,

Garland, and Mitchell; (2) the Eighth Amendment medical indifference claims against Garland, Gravel, and Mandalaywa; (3) the First Amendment retaliation claims against Garland, Manson, and Woodruff; and (4) the Fourteenth Amendment due process claims against Woodruff and Venettozzi; and it is further

**ORDERED**, that all remaining claims are **DISMISSED with prejudice** pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b) for failure to state a claim upon which relief may be granted; and it is further

**ORDERED**, that the Clerk shall **TERMINATE** Waldren as a defendant in this action; and it is further

**ORDERED**, that the Clerk shall issue summonses and forward them, along with copies of the Amended Complaint, to the United States Marshal for service upon Uhler, Mitchell, Gravel, Manson, Mandalaywa, and Venettozzi;[5] and it is further

**ORDERED**, that the deadline for Woodruff and Garland to respond to the Amended Complaint is **STAYED** until service on Uhler, Mitchell, Gravel, Manson, Mandalaywa, and Venettozzi is completed. After Uhler, Mitchell, Gravel, Manson, Mandalaywa, and Venettozzi are served, all of the remaining defendants must respond to the Amended Complaint in accordance with the Federal Rules of Civil Procedure; and it is further

**ORDERED**, that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367.  Plaintiff must

---

[5] Because Kyle W. Sturgess, on behalf of the Office of the New York State Attorney General, has appeared in this action as counsel for defendants Woodruff and Garland, the Clerk need not issue summonses for these defendants.

comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to do so may result in the dismissal of this action**; and it is further

**ORDERED**, that the Clerk serve a copy of this Decision and Order on Plaintiff and counsel for the defendants who have appeared in this action.

**IT IS SO ORDERED.**

DATED:    June 26, 2019
          Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge